1

2

3

4

5

6

7                       United States District Court

8                       Eastern District of California

9

10

11   Dominic Wright,

12           Petitioner,                No. Civ. S 02-1656 LKK PAN P

13       vs.                            Findings and Recommendations

14   D. L. Runnels, Warden,

15           Respondent.

16                               -oOo-

17       Petitioner is a state prisoner, without counsel, seeking a

18   writ of habeas corpus.

19       A jury found petitioner guilty of two robberies with a

20   firearm in violation of Ca. Pen. Code, §§ 211, 12022.5, three

21   false imprisonments with a firearm in violation of Ca. Pen. Code

22   §§ 236, 12022.5, and of being a convicted felon in possession of

23   a firearm in violation of Pen. Code, § 12021.  In a separate

24   trial, the court found defendant had a prior serious felony

25   conviction. Cal. Pen. Code §§ 667, subs. (b)-(i); 1170.12.  The

26   court sentenced petitioner to consecutive sentences of

imprisonment totally 33 years and four months:  (1) five years
and four months for the first robbery; (2) 20 years for the
second robbery; (3) two years and eight months for each false
imprisonment; and (4) one year and four months for being a felon
in possession of a firearm.

Petitioner appealed.  The appellate court affirmed the
judgment in a reasoned opinion.

Petitioner filed a petition for review in the California
Supreme Court.  The court denied review.

Petitioner sought habeas relief in the trial court, which
denied relief upon the ground petitioner unreasonably delayed in
seeking relief and failed to justify the delay.

Petitioner sought habeas relief in the appellate court,
which summarily denied the writ.

Petitioner filed a petition for a writ of habeas corpus in
the California Supreme Court.  The court summarily denied the
writ.

The following facts are taken from the state appellate
court's opinion:

FACTS

On the evening of September 30, 1996, four
culprits carried out a criminal enterprise at a Raley's
supermarket.  The store closed at 11:00 p.m., and by
11:30 the night shift employees had arrived.  When the
head night-shift clerk opened the front door to allow
the head evening-shift clerk to leave, the culprits
burst in and pushed both employees to the floor.  The
culprits were dressed in dark clothing and wore masks.
At least two of them had guns.  As the head clerks lay
on the floor, they felt guns pressed against them.

The culprits went about the task of looting the store.  One of the clerks was forced to open the safe, from which the culprits took cash, lottery tickets, food stamps, and gift certificates.  The culprits also went through the cash registers and emptied out the tills.  As they proceeded through the store, they encountered three other night shift employees and ordered them to lie down if they did not want to die.

Two factors contributed to a quick response by sheriff's deputies:  (1) during the robbery a silent alarm was tripped and deputies on patrol were informed of that fact by radio dispatch, and (2) the Raley's safe contained a pack of $20 bills with a tracer device that was activated and began emitting a silent signal when the culprits took the bills.

Two deputies on patrol in a vehicle equipped to read the tracer device were heading toward the Raley's store when the equipment began reading the tracer signal.  The signal was close and was coming from the direction in which they were heading.  As a red compact car passed the deputies, the signal direction reversed, thus indicating it was coming from the car.  When the deputies turned around to follow, they saw the car, with four persons inside, turn into an apartment complex.

The deputies eventually located the car parked in a stall, and saw a suspect getting out of the vehicle.  When the suspect saw the deputies, he climbed over a retaining wall and fled.  Two other suspects were observed coming out from behind a dumpster.  They fled when ordered to stop.  One suspect, Darrell Spann, was tracked and located with the help of a police department canine unit.  Another suspect, John Spann, was arrested after being chased through a park and over a fence.

While the chase was ongoing, other deputies investigated the car and adjacent areas.  The car contained numerous items that established its use in the robbery, including a ski mask, a woolen cap, rolls of quarters, and an empty holster.  Defendant's wallet, containing his driver's license or identification card, was found on the console by the stick shift.  Documents in the car reflected that it was owned by the defendant's brother, Norman Woods, who lived with defendant in unit 212 of the apartment complex.  In adjacent areas, deputies used a tracking device to locate additional items, including sweat pants, a black

wig, gloves, black cloth in the form of a mask, and a backpack that contained over $13,000.

About an hour after the initial chase, deputies at the apartment complex saw defendant's brother, Woods, approaching unit 212.  He was dressed like one of the fleeing suspects had been dressed, and there were grass stains and debris in his hair and on his clothing.  He had a roll of quarters in his pocket.  Woods was arrested at that time.

Defendant's former girlfriend, Larcida Johnson, lived less than a mile down the road from defendant's apartment.  She testified that defendant had been at her apartment at about 9:30 on the evening before the robbery.  He left, saying he was going somewhere with Woods.  Johnson went to bed at about 11:30 p.m.  Some time thereafter, she was awakened by a telephone call from defendant.  He said he was coming over to spend the night.  He arrived at about 3:00 a.m., bringing with him a bag that contained money and two pistols.  Johnson helped defendant count the money; there was about $11,000 in the bag.  Defendant said he got the money from a store.  They put the money and guns under Johnson's bed.  Defendant made a telephone call and then asked Johnson to drive him home.  He was arrested when he arrived there.  Johnson was questioned by the deputies but was not detained.

Early the next morning, defendant called Johnson from jail.  He told her not to talk, and later said the conversation was probably being recorded, which it was.  He said, "Just do that what you were talking about.  Do that," and told her, "Give my friend away."  Johnson testified that by "friend," defendant was referring to the guns he had left at her apartment.  When Johnson expressed reluctance, defendant told her: "Um, you can.  Go to Baylife."  Johnson testified that Baylife was a security guard at her apartment complex.  Defendant replied affirmatively when Johnson asked: "Both of 'em?"  He told her to tell Baylife that defendant said "Merry Christmas."  Subsequently, Johnson asked:  "What I supposed to say [*sic*]?  Um, I can't remember what I was supposed to say.  Them was asking me hella questions [*sic*]."  Defendant replied: "Like what?  You tell them the truth.  He was with me."  Later, when Johnson said she did not know what time defendant came over, defendant said:  "I hear you."  Before closing the conversation he said:  "Well, I was just calling to tell you to move something, baby."

Johnson did not give the guns to Baylife.
Defendant called later and told her to give $1,000 to a
person named Danny so that he could bail Woods out of
jail.  Johnson gave $1,000 and the guns to Danny.
Woods was bailed out of jail by James McLaughlin, who
testified that he was given $1,000 in cash for that
purpose by his brother, Daniel McLaughlin.  After Woods
got out of jail, Johnson gave the rest of the money to
him.

When the trial court took a break during the
testimony of Larcida Johnson, juror number 12 used a
restroom where codefendant Spann was having a
conversation with an unidentified person.  The
conversation ended when the juror was observed, but the
juror heard Spann say the words "he bought it."  The
juror did not hear anything before or after the
statement and described it as a general statement
rather than one reflective of anger or frustration.
Although the juror did not ascribe any meaning to the
statement, he properly called the incident to the
court's attention.  During questioning about it, the
juror assured the court that he could, and would,
totally disregard the incident during deliberations.
The court declined to replace the juror with a
substitute.

This court cannot grant habeas relief unless the state

court's adjudication resulted in a decision that was contrary to

or an unreasonable application of federal law as clearly

established by the United States Supreme Court or in a decision

that was based on an unreasonable determination of the facts in

light of the evidence.  28 U.S.C. § 2254(d)(1), (2).

When a petitioner "challenges the state court's findings

based entirely on the state record," a federal court must first

determine whether the adjudication resulted in a decision based

on an unreasonable determination of the facts.  Taylor v. Maddox,

366 F.3d 992, 999 (9th Cir. 2004).  A state court's determination

is unreasonable if the court failed to make a factual finding

1  when it should have, the state court's factual finding is made

2  under an incorrect legal standard or when the fact-finding

3  process is defective.  <u>Taylor</u>, 366 F.3d 992.  If a federal court

4  finds the state court's determination is reasonable, the court

5  must presume it is correct, although the determination may be

6  rebutted by clear and convincing evidence.  <u>Id.</u> at 999; 28 U.S.C.

7  § 2254(e)(1).

8       When a petitioner challenges a state court's legal

9  determinations, the court must determine whether it is contrary

10 to or an unreasonable application of clearly established federal

11 law.  28 U.S.C. § 2254(d)(1).  A decision is contrary to clearly

12 established federal law if the state court applies incorrect

13 legal authority, or if it applies correct authority to a case

14 involving facts materially indistinguishable from those in a

15 controlling case, but nonetheless reaches a different result.

16 <u>Williams v. Taylor</u>, 529 U.S. 362, 413-14 (2000).  A decision

17 involves an unreasonable application of federal law if the state

18 court identifies the correct governing legal principle but

19 applies it to the facts of the prisoner's case in a manner that

20 is "objectively unreasonable."  <u>Lockyer v. Andrade</u>, 538 U.S. 63

21 (2003).  "Clearly established federal law" is defined as the

22 holdings of the United States Supreme Court existing when the

23 state court issued its decision.  <u>Williams</u>, 529 U.S. at 412.

24 Circuit law is "persuasive authority" for purposes of determining

25 whether a state court decision is an unreasonable application of

26 Supreme Court law.  <u>Clark v. Murphy</u>, 331 F.3d 1062 (9th Cir.

1  2003); <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th Cir. 1999).

2  Where the state court summarily denies relief without

3  comment, the district court will look to the last reasoned state

4  decision on the issue.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797 (1991).

5  If none exists, the district court must independently review the

6  record to determine whether the state ruling was contrary to or

7  an unreasonable application of clearly established federal law.

8  <u>Delgado v. Lewis</u>, 223 F.3d 976, 981-82 (9th Cir. 2000).

9  Petitioner claims the trial court should have removed Juror

10  #12 for bias following the juror's chance encounter with one of

11  petitioner's co-defendants.

12  The appellate court found the trial adequately examined the

13  juror and deferred to the trial court's credibility finding.  It

14  found the encounter was inadvertent, the juror had not engaged in

15  misconduct, promptly had notified the trial court of the incident

16  and that the statement was out of context, meant nothing to the

17  juror and was not inherently prejudicial.  For these reasons, the

18  appellate court determined the trial court did not err in

19  refusing to dismiss Juror #12.

20  The Due Process Clause of the Fourteenth Amendment

21  guarantees an accused an impartial jury, viz., one composed of

22  jurors who are not necessarily ignorant of the facts and issues,

23  but of jurors who can disregard their impressions or opinions and

24  reach a verdict based upon evidence presented in court. <u>Smith v.</u>

25  <u>Phillips</u>, 455 U.S. 209, 217 (1982);  <u>Irvin v. Dowd</u>, 366 U.S. 717,

26  722-23 (1961).  When presented with a colorable claim of juror

1  bias, a trial court should hold a hearing to determine the effect

2  of potentially prejudicial occurrences.  <u>Phillips</u>, 455 U.S. at

3  217.

4       While in the restroom during a recess, Juror #12 heard one

5  of petitioner's co-defendants, Darrell Spann, say, "He bought

6  it."  Petitioner contends this statement shows Juror #12

7  determined petitioner's guilt before trial concluded.

8       Outside the presence of the other jurors, the court examined

9  Juror # 12:

10       Q: My Court Attendant handed me a note that indicates
         that you overheard, overheard a statement made by Mr.
11       Spann in the rest room; is that correct?

12       A. Yes.

13       Q: How long ago was that, sir?

14       A: Approximately ten or fifteen minutes.

15       Q: So just right at this most recent break?

16       A: Yes.

17       Q: All right.  And what did you hear?

18       A: It – I believe he said he bought it.  I don't – I
         don't know, that was all that I heard and I opened the
19       door and I believe they saw me and he didn't say
         anything else.
20
         Q: All right.  And are you sure Mr. Spann said this as
21       opposed to from the other gentleman he was with?

22       A: I am fairly certain.

23       Q: Okay.  What context was it said, do you know?  Did
         you hear anything before?
24
         A: No.
25
         Q: Anything after it?
26

A: No.

Q: What was the tone?  Was it said with anger or frustration or?

Q: Just a general statement.

Q: Did you put any meaning to it?

A: No.

Q: He bought an item, he bought it in terms of some other implication?

A: I have nothing to base that on.

Q: Can you totally disregard this statement for the purposes of your deliberations that is completely put it out of your mind not consider it at all?

A: yes.

Q: All right.  Would you step outside for just a second, sir.  Thank you for your patience with me.

A: You're welcome.

RT. 621-22.

The prosecutor and petitioner's counsel both moved to dismiss Juror #12 upon the ground the juror could have been prejudiced by the statement.  The court reserved ruling until it could voir dire Juror #12 again after the weekend recess.

The second inquiry also occurred outside the presence of the other jurors:

Q: Hi.  How are you this morning?

A: I'm fine.

Q: Why don't you have a seat wherever you would like, sir.

A: Sure.

1    Q: I just wanted to check with you briefly now that
     some time has passed since you overheard Mr. Spann's
2    statement in the bathroom and ask if you reflected on
     it any over the weekend?

3
     A: No, I haven't really thought of it at all.
4
     Q: Ascribe any meaning to it at all?
5
     A: No.
6
     Q: Have any problem with the admonition I gave to you
7    that you have to totally ignore it during the course of
     your deliberation?
8
     A: No, problem.
9
     Q: So, for example, if you did ascribe some meaning to
10   it during the course of your deliberations, you would
     have to conscientiously set that aside and treat it as
11   though you never heard of it.  Can you do that?

12   A: Yes.

13   Q: Thank you very much, sir.  If you would step
     outside.
14

15   RT. 658-59.

16   The court refused to dismiss the juror, finding,

17       [Juror # 12's] demeanor is solid and he says that he
         will not consider it.  I would note there are multiple
18       meanings for that, many of which are totally
         unconnected with the case.
19
             Even if he ascribes some other meaning to it, he
20       indicates he can put that aside and the Court finds
         that credible.
21

22   RT. 659-60.

23       The state court's finding is not an unreasonable

24   determination of the facts in light of the evidence and is

25   entitled to a presumption of correctness which petitioner has

26   failed to rebut.  This claim should be denied.

Petitioner claims the evidence does not support the jury's findings petitioner personally used a firearm or his conviction of being a felon in possession of a firearm.

Personal Use of a Firearm

Petitioner asserts the evidence does not support the finding he personally used a firearm and so his punishment for robbery and for false imprisonment should not have been enhanced.

The appellate court found:

> Here, the evidence established that four culprits carried out the criminal scheme.  When the culprits rushed the door, the head night clerk saw that the first two of them had guns.  He did not notice whether the other two culprits were armed.  During the ordeal, the head night clerk and the head evening clerk were restrained by two of the culprits, each pressing guns into the clerks' heads and backs.
>
> The first two culprits to enter the store, the ones who used guns and maintained control of the head clerks, were noticeably larger than the other two culprits.  Defendant and Woods are each six feet two inches tall, while Darrell Spann and John Spann are five feet seven inches and five feet eight inches tall, respectively.  In addition, according to defendant's girlfriend, Johnson, whose testimony was supported by defendant's recorded telephone call to her from the jail, defendant brought the guns to her home after the incident and asserted ownership and control over them.
>
> This evidence supports a reasonable inference that defendant was one of the larger culprits who personally used a gun during the commission of the crimes.  It was for the jury to determine whether, in light of all of the evidence, the inference should be drawn.  (*People v. Farris* (1977) 66 Cal.App.3d 376, 383-384.)  On appeal, the fact that the inference is a reasonable one is sufficient to sustain the finding against challenge based upon the sufficiency of the evidence.  (*Ibid.*)

To extend a sentence beyond the statutory maximum based upon a fact other than the existence of a prior conviction, the fact

1  must be proven beyond a reasonable doubt.  <u>Apprendi v. New</u>

2  <u>Jersey</u>, 530 U.S. 466 (2000).  A federal habeas court will find a

3  fact not proved beyond a reasonable doubt only if, viewing the

4  evidence in the light most favorable to the prosecution, no

5  rational trier of fact could have found proof of guilt beyond a

6  reasonable doubt.  <u>Jackson v. Virginia</u>, 443 U.S. 307, 324 (1979).

7        California law requires a sentencing court to extend an

8  accused's sentence by 3, 4, or 10 years upon a finding the

9  accused used a firearm in the commission of a felony.  Cal. Pen.

10 Code § 12022.5(a).  What constitutes use of a gun is a matter of

11 state law, viz., evidence the accused has "employ[ed] the gun to

12 neutralize the victim's companions, bystanders, or other persons

13 who might otherwise interfere with the successful completion of

14 the crime."  <u>People v. Granado</u>, 49 Cal. App. 4th 317 (Cal. 1996).

15       The evidence at trial showed that of the four males who

16 rushed the front doors of Raley's as the head night clerk

17 entered, two of them had guns and used them to restrain Carole

18 Peak and Jason Bryner, the head evening and night clerks.  The

19 two with guns were noticeably larger than the others and

20 petitioner and one co-defendant are at least four inches taller

21 than the other two.  Petitioner is 6' 2".

22       Kelly White testified that while working the night of the

23 robbery she saw a thin 5' 6" black male wearing a black baseball

24 cap, a black, short-sleeved T-shirt, black jeans and a red

25 bandanna covering his face about 20 feet away from her.  He told

26 her to "get down on the ground now if you don't want to f- - -

ing die" and she complied.  White did not see a weapon.

Jennifer Griffin testified she noticed a 5' 7" black male with a thin, medium build wearing a bandanna over his face standing about six feet away from her.  The person told her to "come here," but she moved back and so he told her to "get on the ground unless you want to die."  She asked if he was serious and he repeated his command.  Griffin obeyed.  She did not see a firearm.

Terry Mason testified he saw a very thin 5' 6" black male with a red bandanna on his face.  The person gestured with his hands for Mason to get down on the floor and Mason complied. Mason did not see a firearm.

Petitioner arrived at Johnson's apartment around 3:00 a.m. the morning after the robbery with a bag containing $11,000 and two guns, and later directed her to give the guns to a third person.

The state court's determination is not an unreasonable determination of the facts in light of the evidence presented. That determination is presumed correct and petitioner has not rebutted it by clear and convincing evidence.  Petitioner should be denied relief on this claim.

With respect to the false imprisonment counts, the appellate court explained:

> The prosecution's view of the case, which we find to be supported by the evidence and reasonable inferences therefrom, was that defendant and Woods entered the store with guns, seized control over the two head clerks, and used their guns to maintain control over

the head clerks while they forced them to open the safe.  The Spann brothers followed defendant and Woods into the store and went about emptying the tills and otherwise looting while defendant and Woods directed their attention to the head clerks and the safe.  As the Spann brothers encountered the three subordinate employees in the aisles, they ordered them to lay down or die.  None of the subordinate employees saw a gun during the incident.  This scenario, according to defendant, fails to demonstrate that he personally used a gun in the commission of the false imprisonments of the subordinate employees.  We disagree.

*People v. Granado* (1996) 49 Cal.App.4th 317 (*Granado*), drew a distinction "between the victim's knowledge or observations as (sometimes necessary) *evidence* of use, and the victim's knowledge as (in effect) an *element* of use." (*Id.* at p. 326.)  *Granado* held that, while it may sometimes be impossible to prove gun use without evidence of the victim's knowledge or observations, the victim's knowledge is not an element of the enhancement. (*Ibid.*)  The only mental state requirement for a gun-use enhancement is the accused's intent to use the gun in the furtherance of the crime. (*Id.* at p. 328.)  *Granado* added that a gun may be used in the commission of an offense even if the use is directed toward someone other than the victim of that crime. (*Id.* at p. 330.)  For example, a defendant uses a gun in the commission of a crime "when he or she employs the gun to neutralize the victim's companions, bystanders, or other persons who might otherwise interfere with the successful completion of the crime." (*Ibid.*)  The test is functional rather than formulaic. (*Ibid.*)

We agree with the decision in *Granado* and find it controlling here.  Defendant and his cohorts planned a criminal endeavor which required them to gain entrance to the store and seize control over all persons that might be present.  Defendant and Woods used guns to gain and maintain control over the two supervisory employees who were present.  The use of the guns facilitated the commission of the false imprisonment of the subordinate employees in two ways: (1) it emboldened the Spann brothers to order the subordinate employees to lie down or die, confident that defendant and Woods were there with guns to back up the Spann brothers' threats; and (2) it restrained the supervisory employees from providing aid or assistance to the subordinate employees, or otherwise interfering with completion of the criminal enterprise.  This is

1      sufficient evidence to establish defendant's personal
       use of a gun in the commission of the false
2      imprisonments.

3
(Footnote omitted).
4
       The process was adequate and the evidence adduced at trial
5
is sufficient to support the appellate court's determination.
6
That determination therefore is presumed correct and petitioner
7
has not rebutted it by clear and convincing evidence.   Therefore,
8
the state court's decision is not an unreasonable determination
9
of the facts in light of the evidence presented and petitioner is
10
not entitled to relief upon this claim.
11
Conviction of Being a Felon in Possession of a Firearm
12
       Petitioner claims the evidence is insufficient to support
13
his conviction of being a felon in possession of a firearm.
14
       The appellate court found:
15
            In order to support a conviction for illegal
16     possession of a firearm, it is not necessary that the
       firearm be recovered and introduced into evidence.
17     Rather, it is sufficient that the defendant's
       possession of the firearm be established by the
18     testimony of a competent witness. (*People v. Hughes*
       (1966) 240 Cal.App.2d 615, 620; *People v. De Falco*
19     (1959) 176 Cal.App.2d 590, 592; *People v. Billingsley*
       (1958) 161 Cal.App.2d 247, 250-251.)   The evidence we
20     have set forth in connection with defendant's previous
       contention is sufficient to establish his possession of
21     firearms.

22
       The elements of the offense are conviction of a felony,
23
ownership, possession, custody or control of a firearm and
24
knowledge.   Cal. Pen. Code § 12021; <u>People v. Jeffers</u>, 49
25
Cal.Rptr. 2d 86 (Cal. App. 1996).
26

1    Petitioner stipulated to previously having been convicted of

2    a felony and his former girlfriend Larcida Johnson, testified

3    petitioner brought a duffel bag to her apartment containing two

4    guns and about $11,000 the night of the robbery.

5    The fact-finding procedure was adequate, the determination

6    is reasonable in light of the evidence presented and therefore

7    the determination is presumed correct.  Petitioner has not by

8    clear and convincing evidence rebutted the determination and so

9    his claim fails.

10    Petitioner claims instructing the jury it could consider

11    flight as evidence of guilt denied him a fair trial because

12    identity was at issue.

13    Applying state law that mirrors federal law, see People v.

14    Ray, 13 Cal.4th 313, 345 (Cal. 1996); People v. Roberts, 2

15    Cal.4th 271, 310 (Cal. 1992), the appellate court found the

16    evidence supported giving the flight instruction.

17    A jury instruction violates due process when, considering

18    the overall jury charge, the instruction makes the trial unfair.

19    Cupp v. Naughten, 414 U.S. 141, 147 (1973).  Where the evidence

20    tends to show an accused fled because he knew he was guilty of a

21    crime, a jury may consider flight as consciousness of guilt.  See

22    United States v. Blanco, 392 F.3d 382 (9th Cir. 2004).  No

23    Supreme Court precedent prohibits giving an instruction on flight

24    when the defendant's identity is in issue if the evidence

25    supports the instruction.

26    The judge gave the following instruction:

16

> The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty.  The weight to which this circumstance is entitled is a matter for you to decide.

RT. 1023-24.

The trial judge gave the instruction because the evidence showed the individuals in the red car driving away from the store committed the robbery and that the jury could infer those four saw the sheriff's deputies turn to follow them.  When petitioner and his cohorts arrived at petitioner's apartment complex petitioner left his wallet, which contained his identification, in the car.  And in the middle of the night petitioner decided to spend the night at his girlfriend's apartment.

Clearly established federal law does not bar instructing the jury about the implications of flight when the accused's identity is in issue.  Therefore, the appellate court's decision was not contrary to or an unreasonable application of clearly established federal law.

Petitioner claims the prosecutor violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to provide the defense with evidence impeaching the testimony of a prosecution witness; trial counsel provided ineffective assistance by failing to locate and interview a defense witness; and appellate counsel was ineffective for failing to investigate and to seek reversal of the conviction upon the ground the prosecution suppressed

1  exculpatory evidence.

2      Respondent contends this court is barred from considering

3  these claims because of petitioner's default of the rule in <u>In re</u>

4  <u>Clark</u>, 5 Cal.4th 750 (Cal. 1993).

5      Where a prisoner has defaulted his federal claims in state

6  court pursuant to an "independent and adequate state procedural

7  rule," federal habeas review of the claims is barred unless the

8  prisoner can demonstrate cause and prejudice or that the failure

9  to consider the claims will result in a fundamental miscarriage

10 of justice.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991).  A

11 state ground is adequate and independent if the last state court

12 to which the petitioner presented the claim actually relied on a

13 state rule that was sufficient to justify the decision.  <u>Valerio</u>

14 <u>v. Crawford</u>, 306 F.3d 742, 773 (9th Cir. 2002) (en banc), *cert.*

15 *denied*, 538 U.S. 994 (2003).

16     The Ninth Circuit Court of Appeals has determined the rule

17 in <u>Clark</u> to be independent as of 1998, when the California

18 Supreme Court clarified the rule.  <u>See</u> <u>In re Robbins</u>, 18 Cal. 4th

19 770 (1998).

20     Petitioner purportedly defaulted January 22, 2002, when he

21 filed a habeas petition in the Sacramento County Superior Court

22 and so as to petitioner the rule is independent.

23     But the question of adequacy remains open.  A state rule is

24 adequate if it is firmly established and regularly followed by

25 state courts at the time of the purported default.  <u>Lee v. Kemma</u>,

26 534 U.S. 362, 389 (2002); <u>Hill v. Roe</u>, 321 F.3d 787, 790 (9th

Cir. 2003).  The state has the burden of pleading and proving the adequacy of its rule.  Bennett v. Mueller, 322 F.3d 573, 585-86 (9th Cir.), *cert. denied*, 540 U.S. 938 (2003).

Respondent's only argument in support of adequacy is that before petitioner's conviction was final, a different federal court found California courts have consistently and regularly applied the untimeliness rule since Clark.  See Deere v. Calderon, 890 F.Supp. 893, 900 (C. D. Cal. 1995).  This court is not bound by Deere, whose reasoning the Ninth Circuit has questioned in any event.  Bennett, 322 F.3d at 583.  Were this court inclined to rely in the least on Deere, it would not so do in this case since Deere involved California's standards governing capital cases and this is a non-capital case.  The distinction is not without difference; the California Supreme Court has created standards to guide condemned prisoners in determining what constitutes "substantial delay," but other prisoners have no such guidance and so must rely on what California's courts have said "substantial delay" is in the individual circumstances presenting themselves to the judicial system.

Since respondent has not presented an array of non-capital cases decided since Clark showing California's courts have made the standard predictable and understandable, he has failed satisfy his burden under Bennett.

Accordingly, the court must address the merits of petitioner's last three claims.

Petitioner claims the prosecutor withheld exculpatory

evidence.   Due process imposes upon the prosecution an

affirmative duty to disclose to an accused material, exculpatory

evidence. <u>Strickler v. Greene</u>, 527 U.S. 263 (1999); <u>Brady v.</u>

<u>Maryland</u>, 373 U.S. 83 (1963).   Evidence is exculpatory if it is

favorable to the accused either because it affirmatively

demonstrates innocence or because it would impeach a prosecution

witness.   <u>United States v. Bagley</u>, 473 U.S. 667 (1985).   Evidence

is material "if there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the

proceeding would have been different." <u>Bagley</u>, 473 U.S. at 682.

In determining materiality, courts must consider the evidence's

impact both item-by-item and cumulatively.   <u>Kyles v. Whitley</u>, 514

U.S. 419 (1995).

Petitioner asserts the prosecutor suppressed two items: (1)

a tape from the home answering machine of petitioner and

petitioner's brother which purportedly would have shown

petitioner called from his former girlfriend's apartment at the

time of the robbery; and (2) a videotape of the police interview

with petitioner's former girlfriend.

Sheriff's Deputy Danny Minter was inside the apartment

petitioner shared with his brother and co-defendant, Norm Woods.

Deputy Minter noticed the telephone was off the cradle and so he

replaced it.   It is unclear how Deputy Minter gained access to

the apartment but nothing in the record suggests anyone removed

anything from it and petitioner attaches no police reports or

affidavits showing Deputy Minter or any other law enforcement

1 officer seized a tape from the answering machine.  Nor does

2 petitioner submit evidence someone else gave such a tape to the

3 police.  In short, there is no reason to believe the evidence

4 petitioner asserts the prosecution suppressed exists and so there

5 is no basis to find a <u>Brady</u> violation.

6     Petitioner contends the prosecution suppressed a video tape

7 of a detective interviewing Johnson about the robbery and asserts

8 the video would show Johnson testified falsely.

9     In the early morning hours of October 1, 1996, Johnson told

10 a sheriff's deputy petitioner had been with her the night of

11 September 30, 1996.  Detective Minter questioned Johnson October

12 3, 1996, and she again said petitioner was with her the night of

13 September 30, 1996.

14     At trial, Johnson testified that the night of the robbery

15 she went to sleep around 11:30 p.m..  Sometime around 3:00 a.m.,

16 petitioner called to say he was spending the night and arrived at

17 her apartment shortly thereafter with a bag containing two guns

18 and around $11,000.  She hid the money under her bed and the guns

19 in the duffel bag in her closet.  After his arrest, petitioner

20 told Johnson to give the guns to the security guard at her

21 apartment complex.  Instead, she gave them to Danny McLaughlin

22 when she, at petitioner's direction, gave McLaughlin $1,000 for

23 bail for petitioner's brother and co-defendant, Norman Woods.

24 When Woods was released Johnson gave him the rest of the money.

25     Defense counsel used a video tape and transcript of

26 Detective Minter questioning Johnson October 3, 1996, to show

1  that despite substantial pressure near the time of the robbery,

2  Johnson maintained petitioner was innocent.  Detective Minter

3  read California Penal Code sections 32 and 33 pertaining to

4  accomplice liability and told her that the District Attorney's

5  Office was considering perjury charges; that she would have to

6  pass a criminal background check if she wanted to work with

7  children in the future; that petitioner had another girlfriend;

8  that petitioner was using her; that if she did not tell the truth

9  she would be convicted of perjury; and that Detective Minter

10 would help her any way he could.

11     Insofar as this is the video tape to which petitioner

12 refers, the prosecution did not suppress it. Insofar as

13 petitioner refers to a different video tape, he has not

14 identified it with sufficient specificity to show it exists.

15 Accordingly, I find the prosecution did not suppress an

16 exculpatory video.

17     Petitioner claims trial counsel was ineffective.  The Sixth

18 and Fourteenth Amendments entitle an accused to counsel whose

19 advocacy ensures the outcome of a criminal proceeding is

20 reliable.  Strickland v. Washington, 466 U.S. 668, 686 (1984).

21 To establish deprivation of this right petitioner must identify

22 acts or omissions that cannot be said to have been the result of

23 reasonable professional judgment. Strickland, 466 U.S. at 690.

24 He must also must demonstrate the errors undermined the

25 reliability of the outcome of trial, viz., there is a reasonable

26 probability that but for the errors the outcome of the trial

1   would have been different.  Id. at 693-94.

2   Petitioner asserts counsel failed to investigate and to

3   interview a crucial witness.

4   Petitioner does not allege what investigation would have

5   revealed.  Nor does he identify the "crucial witness," or proffer

6   any evidence of what this witness would have said.  Since

7   petitioner has failed to identify any specific incident of

8   professionally unreasonable judgment, his claim fails.  See James

9   v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) (conclusory allegations

10  of counsel's ineffectiveness insufficient to warrant federal

11  habeas relief).

12  Petitioner asserts he told counsel the tape from his home

13  answering machine had a recording of petitioner calling from the

14  witness' residence at the time of the robbery and could have been

15  used to impeach Johnson.  As discussed above, petitioner has not

16  shown such a tape exists.  Accordingly, counsel's failure to

17  obtain it was not professionally unreasonable.

18  Petitioner claims appellate counsel was ineffective for

19  failing to obtain the tape from petitioner's home answering

20  machine and arguing for reversal upon the ground the prosecution

21  suppressed exculpatory evidence.

22  A defendant pursuing an appeal as of right is entitled to

23  counsel's effective assistance.  Evitts v. Lucy, 469 U.S. 387

24  (1985).

25  I have found trial counsel was not ineffective because there

26  is no evidence such a tape exists; for like reason, appellate

counsel's performance was not professionally unreasonable in this regard.  See United States v. Baker, 256 F.3d 855 (9th Cir. 2001) (applying Strickland standard to claim of ineffective assistance of counsel on appeal).

For all the reasons stated, I recommend the court deny the petition for a writ of habeas corpus.

Pursuant to the provisions of 28 U.S.C. § 636(b)(l), these findings and recommendations are submitted to the United States District Judge assigned to this case.  Written objections may be filed within 20 days of service of these findings and recommendations.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge may accept, reject, or modify these findings and recommendations in whole or in part.

Dated:  November 29, 2005.

/s/ Peter A. Nowinski
PETER A. NOWINSKI
Magistrate Judge